

STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FORSYTH COUNTY     21 CVS 2005

CAROLINA FINANCIAL ) 
SECURITIES, LLC, )
   Plaintiff, )
)
vs. )     **VERIFIED COMPLAINT**
)
T3 COMMUNICATIONS, INC., )
   Defendant, )
)
)
)

Now comes the Plaintiff Carolina Financial Securities, LLC, by and through counsel, complaining of the Defendant T3 Communications, Inc. as follows:

## Parties and Jurisdiction

1. Plaintiff Carolina Financial Securities, LLC ("CFS") is a North Carolina limited liability company with its registered office located in Forsyth County.

2. Defendant T3 Communications, Inc. ("T3") is a Nevada corporation with its principal office located in San Antonio, Texas.

3. Jurisdiction is proper pursuant to N.C. Gen. Stat. § 1-75.4(5) as Defendant contracted to pay for services performed by Plaintiff in this State.

4. Venue is proper under N.C. Gen. Stat. § 1-79.

## Factual Background

5. CFS is a registered broker-dealer and a member of the Financial Industry Regulatory Authority ("FINRA").

6. T3 provides tools and resources to allow a business to manage its communications environment. T3 sought investor and/or lender financing to support T3's growth plans.

7. T3 engaged CFS as its non-exclusive placement agent to assist, on a best efforts basis, in a private placement pursuant to Rule 506 of Regulation D under the

1

Securities Act of 1933, as amended, ("Securities Act") to raise up to $15 million of senior and/or mezzanine debt.

8. T3 and CFS an engagement letter dated October 14, 2019, a true and accurate copy of which is attached as Exhibit 1 and incorporated by reference ("Engagement Letter").

9. Pursuant to its obligations under the Engagement Letter, CFS (a) assisted T3 in preparing offering materials, (b) advised T3 on appropriate terms and conditions for the proposed investment, (c) contacted potential investors, and (d) coordinated discussions with prospective investors. T3 prevented CFS from fulfilling its obligation to supervise closing procedures for the financial transaction by unilaterally and without valid cause terminating the Engagement Letter on July 30, 2020 ("Termination Notice"), which will be discussed in greater detail.

10. Over the course of over nine (9) months from the date of execution of the Engagement Letter through T3's Termination Notice, CFS successfully provided its best efforts in accomplishing T3's goal of securing financing – T3 secured financing of $20 million from Post Road Group ("PRG") of which T3 had drawn down $14 million at closing.

11. CFS solicited 84 institutions on behalf of T3, obtained non-disclosure agreements from 12 institutions (including PRG), obtained a signed indication of interest from Boundary Street Capital, and obtained a term sheet from PRG.

12. CFS engaged in significant and material communications with T3 throughout the Engagement Period (as defined in the Engagement Letter). A survey of CFS' records shows that T3 emailed CFS 858 times and CFS emailed T3 867 times during the Engagement Period. There were 39 conference calls involving CFS and T3 initiated by CFS (and considerably more conference calls involving CFS and T3 that were initiated by T3). There were more than 1,953 minutes spent on cell phone calls between CFS and T3 representatives.

13. CFS produced the solicitation materials and financial modeling (i.e., the Offering Materials) that enabled the financing discussions to occur with PRG. The Issuer lacked the internal ability to produce the materials that would have been satisfactory to entice investor interest. CFS invested extraordinary time and effort turning T3's financial data and other due diligence items into a useable form – T3 presented these documents to CFS in terrible shape.

14. It certainly speaks to the high quality of the efforts of CFS that Antonio Estrada of T3 attempted to hire away the CFS Vice President assigned to the T3 transaction.

15. At no point in time over the course of the engagement period did T3 ever suggest any reluctance to pay the Placement Fee (as defined and as set forth in Section 4 of the Engagement Letter) ("Placement Fee") to CFS for an investment by PRG.

16. On December 19, 2019, PRG executed a non-disclosure agreement with T3 based on the efforts of CFS to discuss a financing transaction.

17. On December 20, 2019, CFS sent a 41-page confidential document seeking acquisition financing to PRG detailing T3's business, the proposed acquisition of Nexogy, Inc. and ActivePBX by T3, the financial status of all 3 companies, the synergies to be obtained from the acquisitions, and a proposed structure. CFS assisted in the creation of this document.

18. The financing was to fund the acquisition of Nexogy, Inc. and ActivePBX, two telephony services companies, following T3's recent acquisition of several other similar companies.

19. T3 was not prepared to effectively present its own historical operating data, that of the companies it was intending to acquire (such as historical customer "churn"), or proforma financial information for the combined entities (collectively, the Financial Information"), all of which was essential to securing committed term sheets from each of PRG and Boundary Street Capital (which also provided a term sheet at the same time).

20. No investor would move forward in its consideration of the offering without having this Financial Information to evaluate.

21. T3 aggressively utilized CFS to help create this essential Financial Information.

22. T3's CFO continuously utilized CFS as a supporting resource for developing the Financial Information even though this work by CFS went beyond the scope of the Engagement Letter.

23. Throughout the Engagement Period, CFS was actively engaged in pursuing PRG as a potential financial partner for T3.

24. CFS was actively engaged in obtaining and reviewing a term sheet from PRG.

25. T3 actively and aggressively used CFS' resources to the fullest to reach a term sheet commitment from PRG.

26. The Placement Fee was disclosed as a use of proceeds in the proforma financial statements provided to, reviewed with, and used by PRG in its analysis of a potential loan to T3.

27. At no time did any representative of PRG indicate an unwillingness to pay the Placement Fee at the time the loan was funded.

28. In July of 2020, Bruce Roberts, CEO of CFS, was in communication with Art Smith, CEO of T3, concerning review of the PRG term sheet. Mr. Roberts urged Mr. Smith to compare and contrast the PRG term sheet against the Boundary Street Capital term sheet.

29. On July 30, 2020, Mr. Smith terminated the Engagement Letter without cause.

30. Up until T3 terminated the Engagement Letter, Mr. Roberts was actively engaged in advising T3 on the analysis of and selection between the term sheets received from T3 and Boundary Street Capital.

31. Upon learning that T3 closed the financing deal with PRG, on November 18, 2020, CFS sent an invoice to T3 for services rendered. A true and accurate copy of the invoice is attached as Exhibit 2 and incorporated.

32. On or about November 24, 2020, Digerati Technologies, Inc. ("DTI"), the parent company of T3, announced the closing of the $20 million senior secured credit facility with PRG and the initial funding of $14 million used to close the acquisitions of Nexogy, Inc. and ActivePBX and refinance existing debt.

33. Subsequent to the public announcement of PRG's investment in T3, CFS received a congratulatory email from Boundary Street Capital for CFS' successful efforts in obtaining financing for T3.

34. The Engagement Letter provided that CFS shall be entitled to the fees provided for in the Engagement Letter in the event that a financing event occurs within 12 months of the termination of the Engagement Letter with one of the investors identified during the Engagement Period.

35. PRG was an investor who was identified during the Engagement Period.

36. The closing with PRG occurred prior to the expiration of the 12 month continuation period.

37. CFS earned its Placement Fee.

38. CFS is owed $576,000 pursuant to the terms of the Engagement Letter.

## First Cause of Action:
## **Breach of Contract**

39. The preceding paragraphs are re-alleged and incorporated by reference.

40. CFS and T3 entered into a valid and binding contract via the Engagement Letter.

41. CFS successfully and diligently performed its obligations under the Engagement Letter.

42. CFS was successful in accomplishing T3's goal of securing financing, helping T3 secure financing of $20 million from PRG of which T3 had drawn down $14 million at closing.

43. CFS diligently performed its obligations under the Engagement Letter and is entitled to the Success Fee of $576,000 pursuant to Section 4 of the Engagement Letter.

44. Despite the full and timely performance of CFS, T3 abruptly terminated the Engagement Letter without notice and without cause.

45. CFS performed its obligations pursuant to the Engagement Letter.

46. T3 failed to fulfill its contractual obligations pursuant to the Engagement Letter by failing to pay the contractually agreed Placement Fee after CFS fully performed.

47. T3 terminated the Engagement Letter to avoid paying the Success Fee in which CFS earned through its performance.

48. T3 breached the Engagement Letter by failing to pay CFS its Placement Fee in the amount of $576,000.

49. Through T3's breach of the Engagement Letter, T3 damaged CFS in the amount of $576,000.

WHEREFORE, CFS prays the Court for the following relief:

1. That CFS have and recover from T3 damages in the amount of $576,000;

5

Case 1:21-cv-00408-WO-LPA   Document 3   Filed 05/24/21   Page 5 of 16

2. That CFS have and recover interest at the maximum allowable rate, accruing from the date of breach, pursuant to N.C. Gen. Stat. § 24-5;

3. That the costs of this action including reasonable attorney fees be taxed to T3; and

4. For such other relief as the Court deems just and proper.

This the 15th day of April, 2021.

*Timothy Nerhood*
Timothy Nerhood
NC State Bar No. 25432
Joshua Dearman
NC State Bar No. 49154

**OF COUNSEL:**
**Hendrick Bryant Nerhood & Sanders, LLP**
723 Coliseum Drive, Suite 101
Winston-Salem, NC 27106
Telephone: (336) 723-7200
Fax: (336) 723-7201

| CAROLINA FINANCIAL | ) |
| SECURITIES, LLC, | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )     **VERIFICATION** |
| | ) |
| T3 COMMUNICATIONS, INC., | ) |
|     Defendant, | ) |

I, Bruce Roberts, first being duly sworn, depose and say that:

    I, Bruce Roberts, am a Manager of the Plaintiff in this action; that I have read the foregoing Complaint and know the contents thereof; that the same is true of my knowledge except to those matters set out on information and belief, and as to those matters, I believe them to be true.

    This the 1st day of April, 2021.

    _____
    Bruce Roberts, Manager
    Carolina Financial Securities, LLC

State of North Carolina / County of Buncombe

    I, the undersigned, a Notary Public of said County and State aforesaid, certify that Bruce Roberts, either being personally known to me or proven by satisfactory evidence, acknowledged to me that he is Manager of Carolina Financial Securities, LLC and voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated.

    Witness my hand and official stamp or seal, this 1st day of April, 2021.

_____
Notary Public

JAMIE C. WALL
Notary Public - North Carolina
Buncombe County
My Commission Expires Jun 30, 2025

7

# Exhibit 1

Engagement Letter

October 14, 2019

Art Smith
Digerati Technologies, Inc
T3 Communications, Inc
825 W. Bitters, Ste 104
San Antonio, Texas 78216

Dear Art,

      This letter agreement ("**Agreement**") confirms our understanding that T3 Communications, Inc. , a NEVADA CORPORATION with its principal place of business located at 825 W Bitters, Ste 104, San Antonio, Texas, 78216, (the "**Company**") has engaged Carolina Financial Securities, LLC of Brevard, North Carolina (including its affiliates "**CFS**") as its Non-Exclusive placement agent for the term set forth below. CFS will assist the Issuer, on a best efforts basis, in a private placement pursuant to Rule 506 of Regulation D under the Securities Act of 1933, as amended (the "**1933 Act**") to raise up to $15 million of Senior/and or Mezzaine Debt (the "**Securities**") incorporated herein by reference (the "**Financing Transaction**"). CFS is a registered broker-dealer and a member of the Financial Industry Regulatory Authority ("**FINRA**").

      This Agreement sets forth the terms and conditions pursuant to which CFS will provide certain investment banking services as described herein. The engagement described herein shall be in accordance with applicable laws and pursuant to the following procedures, terms, and conditions.

1. **Term:** The term of this Agreement will be for a period of 4 Months commencing on the execution of this Agreement (the "**Initial Term**"). Upon expiration of the Initial Term and any Renewal Term (as defined herein), this Agreement will automatically renew for a renewal term of 30 days (each a "**Renewal Term**") unless CFS or the Company provides the other with written notice of nonrenewal at least thirty (30) days prior to the expiration of the Initial Term or at least fifteen (15) days prior to the expiration of the then-current Renewal Term, as applicable. The Initial Term and any Renewal Term are referred to collectively herein as the "**Engagement Period**". Unless sooner terminated as provided herein, the engagement of CFS as placement agent shall expire upon the closing of the Financing Transaction contemplated hereby.

*AS*
_____
Initial

P.O. Box 1076 ♦ Brevard, NC 28712 ♦ Tel: 828 393 0088 ♦ Fax: 828 883 4402 ♦ Email: compliance@carofin.com
Securities offered through Carolina Financial Securities, LLC., Member FINRA/SIPC.
Carolina Financial Securities, LLC. is affiliated with Carolina Financial Group, LLC.

      d) Coordinate meetings or telephone discussions with prospective investors; and

      e) Supervise closing procedures for the Financing Transaction.

Notwithstanding the foregoing, where CFS assists the Company in preparing any Offering Materials addressed to, or to be distributed to, third parties, the Company is solely responsible for the information contained in such Offering Materials. The Company is also solely responsible for all information made available to investors through any online data site, including financial and statistical information included therein.

The Company acknowledges that CFS does not provide tax, accounting, or legal advice and further acknowledges that the Company will rely on separately engaged professional advisors in connection with such matters.

4. **CFS Compensation:** The Company agrees to pay CFS for its services according to the following schedule, with placement fees (in the aggregate, the "**Placement Fee**") payable by wire transfer concurrent with receipt by the Company of the proceeds from the Financing Transaction.

    a) **Due Diligence Fee:** Upon signing of this Agreement, the Company shall pay CFS a non-refundable due diligence fee of $3,500.

    b) **Retainer:** Due on November 1st, 2019, the Company shall pay CFS a non-refundable retainer of $3,000

    c) **Cash Success Fee for CFS Investors:** A cash fee to CFS for acting as placement agent for the Financing Transaction equaling 5% for up to $3,000,000, 4.0% for amounts in excess of $3,000,000 and up to $10,000,000, and 3.65% for amounts in excess of $10,000,000 of the gross proceeds received by the Company for the Financing Transaction from investors approved by Company (the "**CFS Investors**"). Company approval of CFS Investors will not be unreasonably withheld.

CFS will be paid 50% of the Cash Success Fee for lenders or investors listed in Exhibit E to this Agreement.

    d) **Investor Verification Expenses:** If the Company offers its Securities pursuant to Rule 506(c) of Regulation D, CFS will utilize Verifyinvestor.com to conduct the proper investor verification steps, as required by the rule, on behalf of the Company. Upon receipt of a written request from CFS, the Company shall advance to CFS, through a wire

                                                    *AS*
                                                    **Initial**

providers ("**Diligence Provider(s)**") to assist CFS in obtaining and verifying any information which CFS deems necessary for its due diligence obligations.

The Company agrees to have any reports prepared by the Diligence Provider(s) or CFS shared with CFS investors as part of the Financing Transaction, so long as such report does not display any personal or confidential information about any of the Company's Representatives. Such personal and confidential information includes any personally identifiable financial information, personal information such as date of birth, complete government identification numbers, and any other information that CFS may deem personally identifiable.

Further, the Company authorizes CFS and the Diligence Provider(s) to conduct background checks for all persons owning twenty percent or greater of the Company and key managers. CFS and the Diligence Provider(s) may also conduct background reviews for other companies for which such persons or managers own or control more than twenty percent (20%) of the equity. Exhibit C (CFS Policy on Collection of and Protection of Consumer Information and Records) will be executed by the individuals involved in these background checks.

7. **Information Provided by the Company:** In connection with this Agreement, the Company will furnish CFS and the Diligence Provider(s) with all information requested concerning the Company which CFS or the Diligence Provider(s) deem reasonable and appropriate, and will provide CFS and the Diligence Provider(s) with reasonable access to Company officers, directors, employees, accountants, counsel and other representatives (collectively, the "**Representatives**"), it being understood that CFS will rely solely upon such information supplied by the Company and its Representatives without assuming any responsibility for independent investigation or verification thereof. However, such reliance does not terminate the rights of CFS and the Diligence Provider(s) to investigate or verify such information as CFS or the Diligence Provider(s) deem appropriate for due diligence purposes.

The Company represents and warrants to CFS and the Diligence Provider(s) that, unless otherwise clearly noted thereon, all information made available to CFS and the Diligence Provider(s) pursuant hereto will, to the best of the Company's knowledge, be complete and correct in all material respects and will not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The Company further represents and warrants to CFS and the Diligence Provider(s) that, unless otherwise clearly noted thereon, any and all projections (financial or otherwise) provided to CFS and the Diligence Provider(s) pursuant hereto will


Initial

DocuSign Envelope ID: 6BE94866-C7EE-444C-A741-FD0BE72085B3

the Company shall not engage in general solicitation when marketing the Securities.

The Company shall cause the Investors to execute the closing documents pertaining to the Financing Transaction through CFS, and shall cause such Investors to supply CFS with any documentation CFS reasonably requests from the Investors for its compliance with laws and administrative rules. Such documents may include, but are not limited to: A Customer Record Form, CFS' signed Privacy Policy, a copy of executed closing documents pertaining to the Financing Transaction, a Certification Regarding Beneficial Owners of Legal Entity Customers, and copies of government issued ID's for managers of legal entities and formation documents for those legal entities.

10. **Certain Representations and Warranties of the Company:**

    a) **No Other Offers:** The Company has not made and will not, directly or indirectly, make any offer or sale of any of the Securities or any securities of the same or similar class as the Securities, the result of which would cause the offer and sale of the Securities to fail to be entitled to the exemption from registration afforded by Section 4(a)(2) of the 1933 Act, Regulation D under the 1933 Act, or any other exemption under the 1933 Act. The Company represents and warrants to CFS that it has not, directly or indirectly, made any offers or sales of the Securities or securities of the same or a similar class as the Securities during the six-month period ending on the date of this Agreement and has no intention of making an offer or sale of the Securities or securities of the same or a similar class as the Securities for a period of six months after completion of the Financing Transaction, except for offers and sales, the result of which, based upon the advice of the Company's legal counsel, would not cause the offer and sale of the Securities contemplated hereunder to fail to be entitled to the exemption from registration afforded by Section 4(a)(2) of the 1933 Act, Regulation D under the 1933 Act, or any other exemption under the 1933 Act. As used herein, the terms "offer" and "sale" have the meanings specified in Section 2(a)(3) of the 1933 Act.

    b) **Power and Authority:** The Company represents and warrants that it has all requisite power and authority to enter into and carry out the terms and provisions of this Agreement, and that the execution, delivery, and performance of this Agreement does not breach or conflict with any agreement, document, or instrument to which it is a party or bound and this Agreement has been duly authorized, executed, and delivered by the Company.

11. **Rule 506 Disqualification Event Questionnaires and Disclosure:** Each of the Company; any affiliated issuer; any director, executive officer, or any other

*AS*
Initial

15. **Termination:** CFS may terminate this Agreement and abandon the Financing Transaction at any time if the Company fails to perform their obligations under Sections 7 and 11 hereof, or if CFS determines that the Financing Transaction would not meet suitability requirements under FINRA Rule 2111. The Company may terminate this Agreement any time following the end of the Engagement Period, with or without cause, upon written notice thereof to CFS; provided, however, that (a) any termination or completion of CFS's engagement hereunder shall not affect the parties' indemnification obligations or confidentiality obligations, (b) CFS shall be entitled to the fees provided for in this Agreement in the event that (i) at any time prior to the expiration of twelve (12) months following such termination of or expiration of this Agreement an agreement in principle or definitive agreement to effect a financing of the Company of any kind is entered into involving investors identified during the Engagement Period and (ii) at any time thereafter such financing is consummated, or (iii) any securities substantially similar to the Securities are sold using the Offering Materials within twelve (12) months following the termination or expiration of this Agreement; and (c) any termination of CFS's engagement hereunder shall not affect the Company's obligation to reimburse the expenses accruing prior to such termination to the extent provided for herein.

16. **Advertisements:** CFS shall have the right, subsequent to the closing of the Financing Transaction, to place customary "tombstone" advertisements at its own cost in financial and other newspapers and journals describing its services hereunder.

17. **Governing Law; Venue:** This Agreement shall be governed by and construed in accordance with the internal laws of the State of North Carolina, without regard to principles of conflicts of law. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their successors and permitted assigns.

    In connection with any legal suit or proceeding arising with respect to this Agreement, each of CFS and the Company shall submit to the jurisdiction of the United States District Court for the Eastern District of North Carolina and of any state court located in the City of Raleigh, North Carolina, and agree to venue in such courts. EACH OF CFS AND THE COMPANY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF CFS PURSUANT TO, OR THE PERFORMANCE BY CFS OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.

*AS*
Initial

DocuSign Envelope ID: 6BE94866-C7EE-444C-A741-FD0BE72085B3

Art all of us at CFS are honored to be working on this assignment with T3 which we appreciate, is very important to your company.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to me the enclosed letter.

SINCERELY,

Carolina Financial Securities, LLC

By: *(DocuSigned signature: RDKA)*
Bruce V. Roberts
President

Agreed to and accepted as of the above date.

ON BEHALF OF THE COMPANY

T3 Communications, Inc.

By: *Arthur L. Smith*
Art Smith
CEO

*[Signature Page to Engagement Letter]*
Addendum A

DocuSign Envelope ID: 6BE94866-C7EE-444C-A741-FD0BE72085B3

## ADDENDUM A

Pursuant to the foregoing letter agreement dated October 14, 2019 (the "**Agreement**"), T3 Communications, Inc. , a Nevada Corporation, with its principal place of business located at 845 W. Bitters, Suite 104, San Antonio, Texas 78216, (the "**Company**"), retained Carolina Financial Securities, LLC ("**CFS**") to provide the investment banking services described in the Agreement in connection with the proposed issuance, offering and sale (the "**Financing Transaction**") of Senior/and or Mezzaine Debt of the Company (the "**Securities**"). The term "**Offering Materials**" shall have the meaning set forth in the Agreement.

Pursuant to the Agreement, the parties agree as follows:

a)

(i) The Company shall indemnify and hold CFS harmless against any losses, claims, damages or liabilities to which CFS may become subject under the Securities Act of 1933 ( the "**1933 Act**"), the Securities Exchange Act of 1934 (the "**Exchange Act**"), the various state securities acts or other laws or regulations, insofar as such losses, claims, damages or liabilities (or actions in regard thereto) arise out of or are based upon any violation by the Company or anyone acting on behalf of the Company, any untrue statement or alleged untrue statement of any material fact contained in the Offering Materials or state "blue sky" applications prepared by or on behalf of Company or any amendment or supplement thereto prepared by or on behalf of Company, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein in order to make the statements made, in light of the circumstances under which they were made, not misleading in each case, other than information supplied or omitted by CFS or any representative of CFS. Company will also reimburse CFS for such legal or other expenses reasonably incurred in connection with the investigation or defense of any such losses, claims, damages, liabilities or actions. The foregoing indemnity shall extend upon the same terms and conditions to, and shall inure to the benefit of, CFS's employees, independent contractors, officers, and directors and each person, if any, who "controls" any of them within the meaning of the 1933 Act or the Exchange Act; and

(ii) CFS shall indemnify and hold the Company harmless against any losses, claims, damages or liabilities arising out of or based upon the negligence of <u>CFS</u>, its officers, directors, or employees, up to the amount of fees CFS has received pursuant to Section 4 of the Agreement. In the event that CFS is found to be the indemnifying party due to gross negligence or willful misconduct of its officers,

Initial

DocuSign Envelope ID: 6BE94866-C7EE-444C-A741-FD0BE72085B3

party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Company on the one hand and CFS on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and CFS on the other shall be deemed to be in the same proportion as the total net proceeds from the Financing Transaction (before deducting expenses) received by the Company bear to the total fees and commissions received by CFS, in each case as set forth in the Agreement or the Offering Materials. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company on the one hand or CFS on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission, and the extent any such party is prejudiced by the failure of an indemnified party to provide notice as specified in section (b) above. The Company and CFS agree that it would not be just and equitable if contributions pursuant to this section (c) were determined by pro rata allocation (even if CFS were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to above in this section (c). The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this section (c) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this section (c), CFS shall not be required to contribute any amount in excess of the amount by which the total price at which the Securities placed by it were offered to the public exceeds the amount of any damages which CFS has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(d) The obligations of the Company herein shall be in addition to any liability that the Company may otherwise have and shall extend, upon the same terms and conditions, to each person, if any, who controls CFS within the meaning of the 1933 Act.

*AS*
Initial

# Carolina Financial Securities, LLC

100 Elks Club Rd.
Brevard, NC 28712

# Invoice

| DATE | INVOICE # |
|---|---|
| 11/18/2020 | 1081 |

**BILL TO**

T3 Communications, Inc.
825 W. Bitters, Ste. 104
San Antonio, TX 78216

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/18/2020 | 5% Investment Banking fee for 1st $3MM raised | 150,000.00 |
| 11/18/2020 | 4% Investment Banking fee for amount raised in excess of $3MM and up to $10MM | 280,000.00 |
| 11/18/2020 | 3.65% Investment Banking fee for amount raised in excess of $10MM ($10MM to $20MM) | 365,000.00 |

**Total** $795,000.00

Wire to: Carolina Financial Securities, LLC
Bank: Fifth Third Bank
38 Foundation Square Plaza
Cincinnati, OH 45263
ABA: 042000314
Account: 7472558225

Exhibit 2